# Prince George Sewerage and Water Company

### v.

# Bexley Limited Partnership

Record No. 930755

April 15, 1994

Present: All the Justices

*Charles E. Ayers, Jr. (Cynthia A. Muncie; Ayers & Stolte,* on brief), for appellant.

*James D. Davis (Manning, Davis & Kirby,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

This appeal is the culmination of a protracted dispute between a private water and sewer company and its principal customer. The main question presented is whether the trial court misinterpreted a contract dealing with the furnishing of water and sewer services.

In September 1981, appellant Prince George Sewerage and Water Company, a privately owned non-public service Virginia corporation, and Broad Enterprises, Inc., predecessor to appellee Bexley Limited Partnership, executed a 12-page, 26-paragraph written agreement labelled "Rate Contract." Broad Enterprises was the owner and oper-

ator of Bexley Park, a mobile home park in Prince George County. The following contractual provisions are pertinent to this litigation.

The Company agreed to provide, effective September 1, 1981, water and sewer services to Broad Enterprises "until this Contract is terminated or otherwise becomes cancelled or null and void." The Contract fixed the utility rate at $1,815.00 monthly for the balance of 1981. Commencing in 1982, "and for all subsequent years thereafter," the Contract established the rate at the greater of either $1,815.00 or the amount computed by use of a complicated formula set forth in the Contract. The factors in the formula included, *inter alia,* the original cost of the Company's property, depreciation, and percentage use of all utility services furnished to Broad Enterprises or its successor. The Contract permitted adjustment in the monthly rate "from time to time to reflect increases in the number of trailer pads in use within Bexley Park . . . in excess of seventy (70) pads."

In paragraph 18, the agreement provided that either party may cancel the Contract "without cause" by giving the notice required in the document. The paragraph also provided that unless the agreement "be cancelled, terminated or declared null and void pursuant to the terms of this Rate Contract it shall be deemed automatically renewed for the next ensuing calendar year, pursuant to all its terms and provisions, and subject to the rate computed pursuant hereto." In the event of cancellation, the Contract gave the Company "the absolute right" to cease all water and sewer services to Broad Enterprises.

Paragraph 19 permitted assignment of the Contract by Broad Enterprises to any purchaser of the Bexley Park facility upon the purchaser's written agreement to all the Contract's terms and conditions. The paragraph also provided that, in the event of an assumption, either the Company or the assignee could cancel the Contract upon giving the notice required in that paragraph.

Finally, paragraph 24 provided: "This Rate Contract shall not be amended or modified except by a written instrument authorized and executed by the parties hereto, with the same formality as this Rate Contract."

Subsequently, Bexley Limited Partnership (hereinafter, the customer) purchased the trailer park. As assignee, it agreed to the terms of the Contract.

Against the background of the Contract, which both parties treat as unambiguous, we shall recite the facts in the light most favorable to the customer, the party prevailing below. In April 1986, citing "increases in operating expenses," the president of the Company notified the customer in writing that the monthly rate for water and sewer

services would be increased to $3,982.50 effective June 1, 1986. The notice also stated that the Company is "considering terminating the water and sewer services which it presently provides."

In July 1986, the Company's president notified the customer in writing that effective October 1, 1986 the "Company will be ceasing its operations and terminating all of the water and sewer services it presently provides." During September 1986, new owners acquired the Company. The July threat to terminate utility service was never implemented, and the customer paid the increased rate demanded in the April 1986 notice until February 1989.

During that period, the Company and the customer were engaged in an ongoing dispute over the amount of the rate and the quality of the water. The customer received "zillions" of complaints from trailer park residents about water quality. The customer made clear, orally and in writing, that the increased rate was being paid under protest.

At one point, in December 1988, the Company's attorney notified the customer that the "Company is terminating the contract and its services as of January 1, 1989." Again, this threat was not implemented and the Company continued to provide services to the trailer park. The dispute remained unresolved, and the customer refused to pay any amount for utility services during 11 months in 1989.

In July 1990, the Company filed this action against the customer, relying on the provisions of the Contract. The Company sought recovery in the amount of $43,807.50, plus late charges, interest, and attorney's fees. The principal sum represents charges for 11 months at $3,982.50 each, the amount of the monthly rate set forth in the April 1986 notice of increase. Responding, the customer acknowledged receipt of the utility services, but asserted that the monthly charge of $3,982.50 was "an incorrect sum" and "not in keeping with the written contract." The customer alleged that the "payments were made under duress by threat of termination of services."

In a counterclaim, the customer alleged that the monthly charges imposed "from 1984 forward to date" violated the Contract terms "and the formula for determining same." Thus, the customer asserted, it had paid charges in excess of the amount required by the Contract and sought a refund of $88,185.00, plus interest and attorney's fees.

In a December 1990 letter, the Company's attorney notified the customer and its attorney that "all water and sewer services" to the trailer park "will terminate as of June 17, 1991." The letter also stated that the "actual termination" would be subject to an injunction that had been issued by the court below requiring the Company to continue

providing the services. Apparently, the Company is still furnishing the services.

The trial court considered evidence in the case during hearings in November 1991 and January 1992. In a July 1992 letter opinion, the trial court ruled on most of the substantive issues, some of which are not involved in this appeal.

Pertinent to the appeal, the court reiterated a ruling made at the first hearing that the April 1986 notice "was ineffective in modifying the rate due to the fact that it did not follow the very specific requirements for modifying the rate agreement." Thus, the court ruled that the Contract formula was the "means by which the rate would be calculated." The court further ruled that the Contract had not been terminated and that the "rate agreement was still in effect at the time of the trial." Additionally, the court ruled that the Company was entitled to recover the unpaid amounts "at the monthly rates pursuant to the formula" and late charges, interest, and attorney's fees "for these 11 months."

The court also ruled that the customer was not estopped from claiming a refund of excess payments, but decided that the applicable statute of limitations prevented the customer from recovering any overpayments made prior to January 16, 1986. The court then continued the matter for a third hearing at which counsel would present calculations fixing the exact amounts due, utilizing the Contract formula.

Following an October 1992 hearing, the trial court, in another letter opinion, decided that the Company was entitled to recover $25,400.00 for the 11 payments due in 1989 but that the customer was entitled to recover for overpayments in the amount of $74,503.34. Thus, the court decided, subtracting the amount due the Company from the overpayments, that the customer was entitled to judgment in the amount of $49,103.34. Because the court had determined after the third hearing that "there has always been a very substantial overpayment balance," upon reconsideration, the court refused to allow the Company to recover late fees, interest, or attorney's fees for "*any* late payment."

A March 1993 final order incorporated the foregoing rulings. In addition, the order continued the previously entered injunction for 90 days from the date of the order, or until the Company satisfied the judgment in favor of the customer, "whichever shall first occur." Also, the court fixed the utility rate at $2,288.99 monthly, beginning January 1993, in accordance with the formula. The Company appeals.

On appeal, the Company contends, first, that the trial court erred in finding that the Contract was not "modified" pursuant to the April

1986 notice of rate increase. The Company argues that the Contract permitted "modification" in this fashion and that the "modification" was accomplished by the notice. We do not agree.

■ The Contract did not authorize a modification by unilateral action of one of the parties, except in the case of increases in the number of trailer pads, a provision not relevant here. The Contract could be "cancelled" by unilateral action accompanied by the required notice, not "modified." Paragraph 24 governs modifications, and requires "a written instrument authorized and executed by the parties . . . , with the same formality as this Rate Contract." The arbitrary April 1986 notice, of course, did not comply with paragraph 24.

■ As part of its argument that the contract was effectively modified, the Company contends that because the customer paid the increased rate "without protest or complaint" until this action was filed, the customer "is estopped from denying the existence of a rate change." The fallacy in this position is that it is based on an incorrect premise. The trial court found as a matter of fact that the increased rate was paid under repeated protests, both written and oral, and there is abundant evidence in the record to support the court's finding. The Company does not elaborate on the estoppel argument beyond the above statement and we shall not discuss it further.

Second, the Company argues that the trial court erred in refusing to rule that the Contract was cancelled by either the December 1988 or December 1990 letters purporting to terminate the Contract on January 1, 1989 and June 17, 1991, respectively. Pointing to the Contract provision allowing either party to cancel the agreement upon written notice, the Company says the trial court's ruling rendered the unambiguous termination provisions "meaningless."

■ We reject this contention. The record establishes that the Contract, in fact, was not terminated, "the best proof being in the pudding," as the trial judge observed.

■ Disregarding the repeated threats to discontinue service, the Company continued to provide the service voluntarily until the trial court ordered that service not be interrupted. Moreover, this very action is based on the Contract; in the motion for judgment, the Company treats the Contract as existing and seeks to enforce collection, in accordance with the Contract, of past due rate charges. Furthermore, when the Company changed ownership in September 1986, Indukumar M. Patel became president. At trial, Patel agreed that "this contract is still in effect." In sum, the record amply supports the trial court's finding "that there has not been an effective termination of the 1981 rate agreement."

Third, the Company claims that the trial court erred in modifying its ruling and refusing to allow recovery of late charges, interest, and attorney's fees after having earlier indicated it would allow such recovery. We disagree.

■ Whether to disallow those items, after having indicated to the contrary, was a matter entirely within the trial court's discretion. It was not until the Contract formula was applied to the numbers developed during the third hearing that it became apparent to the court that "there has always been a very substantial overpayment balance." We cannot say that the trial court abused its discretion in denying the Company recovery of those items when the court ultimately determined the Company had accumulated sums in excess of the amounts actually due.

Consequently, we hold that the trial court correctly interpreted the contract and correctly ruled on the other issues in the case. Thus, the judgment below will be

*Affirmed.*